**YOHO v. UNITED STATES.**

No. 13423.

United States Court of Appeals
Ninth Circuit.

Jan. 30, 1953.

Quincy Benton, Fairbanks, Alaska, for appellant.

Charles B. Murray, Asst. Atty. Gen. and Robert G. Maysack, Atty., Dept. of Justice, Washington, D. C., for appellee.

Before DENMAN, Chief Judge, and BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

The appellant was convicted of the crime of larceny as defined in § 65–5–41, Alaska Compiled Laws, 1949. The indictment charged that he with another stole a divan and other personal property from the home of one Belval near Fairbanks, Alaska.

Among the errors claimed and specified by the appellant was the action of the court in denying appellant's request for additional time to prepare for a new trial following a mistrial which resulted from a disagreement of the jury. Appellant had previously been brought to trial on the same charge and the mistrial developed and the jury was discharged on January 23, 1952. The case was then set down for retrial five days later, January 28. The action of the court in refusing the request of appellant's counsel for more time to prepare for the retrial was a matter within the sound discretion of the trial judge. Isaacs v. United States, 159 U.S. 487, 489, 16 S.Ct. 51, 40 L.Ed. 229. The record is barren of any evidence suggesting an abuse of that discretion.

Appellant also complains of the manner in which the jury was selected because the trial judge limited the drawing of jurors to those who had telephones or who lived within a fifteen mile radius of the City of Fairbanks. As the action of the judge was authorized by statute,[1] and since no prejudice was shown to have been suffered by the appellant,[2] this contention is without merit.

Assertion is made that the evidence was insufficient to sustain appellant's conviction. While the evidence was circumstantial, it was clearly adequate. The articles claimed to have been stolen were taken from the complaining witness' home, into which someone had broken. They were found in the home of the appellant who was the nearest neighbor, and who told

---

[1] § 55–7–36 Alaska Compiled Laws, 1949: "Drawing jurors from box: Names in jury box. * * * At any drawing of jurors the court or judge may, by an order made at the time of such drawing reject the names of persons drawn whose attendance, in the opinion of the court or judge, cannot be obtained within a reasonable time, or whose attendance may involve a large and unnecessary expense."

[2] Agnew v. United States, 165 U.S. 36, 45, 17 S.Ct. 235, 239, 41 L.Ed. 624: "* * * moreover, the plea is fatally defective in that, although it is stated that the drawing 'tended to his injury and prejudice', no grounds whatever are assigned for such a conclusion, nor does the record exhibit any such." Cf. Hauptman v. United States, 9 Cir., 43 F.2d 86; Wagner v. United States, 9 Cir., 67 F.2d 656. The argument is that those persons living near Fairbanks would be prejudiced against soldiers (appellant was a soldier), because of the frequent commission of crimes by members of the armed forces in that area. No showing whatever was made in support of this claim.

conflicting stories, each of them proven to be false, as to how he had come into possession of them. The evidence measured up to the standards which this court has laid down in such cases. Ferris v. United States, 9 Cir., 40 F.2d 837; O'Leary v. United States, 9 Cir., 160 F.2d 333.

Appellant assigns error of the court in sustaining objections to certain questions put to the defendant, Yoho, by the Government attorney during cross-examination. In his direct examination Yoho had testified that he found the divan, the principal article claimed to have been stolen, in a quonset hut which was used as an outbuilding adjoining the house which Yoho occupied as a home. He testified that he had leased the premises from the Reverend Father Anable about two weeks prior to the time the divan had been found by the complaining witness in Yoho's parlor. His story was that when he took possession of the premises he walked into the storage room and there was the divan behind a pile of lumber. He explained that he discovered the divan when he stood on the lumber. He said he then took the divan into his house and proceeded to use it.

In describing the location of the quonset hut, the storage room, the lumber and the divan, Yoho went into minute detail as to the location of everything about the place, including windows and doors of the building, furniture, crates and boxes that were about the place, the interior of the storeroom, the location of a table in a lean-to shed, and the like. To illustrate the testimony, he produced, and there was received in evidence, a map or drawing showing the location of these various articles. When counsel for the Government took the witness on cross-examination he asked him further about the location of all these features, and also where his car was kept, the location of certain "tarps", of some gasoline cans, and of some tires. He elicited from the witness the statement that one only of these tires belonged to him.

All this was developed without objection. Yoho was then asked whether the other tires "went with the property", to which objection was made on the ground that there was nothing about tires in the indict-

ment, and nothing concerning them on direct examination. The objection was overruled and the witness proceeded to answer that these tires did not belong to the property, that an acquaintance of his had brought some of them there. He was then asked if there was a skill-saw located on the left side of the near garage. He replied that there was; that he did not own the saw but that it belonged to the Army and he had checked it out of the Army tool room. All this inquiry about the location of the skill-saw also proceeded without objection. Thereupon he was asked whether there were extra blades for the skill-saw. Objection was made and overruled. The witness stated that he had not checked out any extra blades for the saw. The examination proceeded: "Q. So if some extra blades were found there, among which was one which would have Northland Construction Company on it, that wouldn't have been part of the saw that you checked out from the tool room, would it? A. No, not that I know of. Q. That would not have been your property, then? A. No." The witness was also interrogated as follows: "Q. If there were a tire there that he had written on it in chalk 'City Electric Company' would that have been your tire or one that this friend probably brought in? A. It wouldn't be my tire."

It is possible that the last quoted questions were objectionable because they assumed something not in evidence. They were not objected to upon that ground. The previously stated objections were to the effect that the inquiry was not proper cross-examination because the subject of tires and a skill-saw had not been gone into on direct examination. The argument here is that this interrogation was not only not proper cross-examination but that it amounted to an attempt to impeach the testimony of the defendant and to prejudice him by questions designed to show that he was in possession of property which he did not own.

■ We think that the inquiries thus made upon cross-examination were not subject to any of the objections which have been urged here. When Yoho on direct

examination described with such painstaking attention to detail and at great length the appearance of the premises, the arrangement of the rooms, and the location of various articles and things there, all illustrated with drawings, it was within the proper range of cross-examination to complete the picture by inquiries as to additional articles that were located there, including gasoline, tarpaulins, tires and skill-saw. If in pursuit of this proper inquiry it developed that other articles having the appearance of having been stolen were also there, the defendant was not in a position to object.

■ Even if this inquiry had been improper, it is clear that the few additional questions which followed the tardy interposition of objections could not be prejudicial, as most of the inquiries, both those relating to the tires and those relating to the skill-saw, were prior to the making of any objection. We find no prejudicial error in this cross-examination.

Finally, it is contended that appellant's conviction must be set aside because the Government attorney in his closing argument to the jury made prejudicial comment upon these matters relating to the tires and the skill-saw. The record shows that during the argument to the jury counsel for the appellant accused the prosecution of a "deliberate smear" of the accused by inquiring about the tires and the skill-saw.[3]

■ When the Government attorney followed with his closing argument he referred to this part of the argument of appellant's counsel and discussed the same incident himself in an evident effort to reply to what counsel for appellant had said.[4] The appellant then objected to the remarks and the court stopped further discussion on that subject.

The court was entitled to conclude that appellant was satisfied that this action of the court removed the prejudice, if any, in the prosecution's remarks, for he failed either to move to strike or to instruct the jury to disregard the evidence. Langford v. United States, 9 Cir., 178 F.2d 48, 55; Heskett v. United States, 9 Cir., 58 F.2d 897; Maki v. United States, 9 Cir., 12 F.2d 668. The judgment is affirmed.

3. What appellant's counsel said was: "Then, ladies and gentlemen of the jury, often times the defense in a criminal trial will take every advantage that is possible for him to take and sometimes step over the line in order to attempt to acquit a criminal. But this is one of the first times in my knowledge, if not the first, where a deliberate smear was put in by this person—I mean the prosecution. This case got down to a point where the prosecution felt it slipping out from under them. It slipped out from under them before because they didn't have any better case than they have right at the present time, so what are they going to do? Over my objections, and you may have thought I was in error to object, but over my objections they asked, 'How about these tires?'—endeavoring to prejudice the minds of the jury against this man. Then, 'How about this skill-saw over in the other side?' Ladies and gentlemen, those things didn't have a thing to do with this particular case. But fortunately for justice, and the justice in this case has had to come from our side, this man and Mr. Williams and Mr. Whitlow that are here—Mr. Whitlow, Mr. Williams and Mr. Yoho were able to tell you how those tires got there. One of the tires belonged to Mr. Williams and one or two of them to Mr. Whitlow. The prosecution was trying to build up something out of nothing. It was a scurrilous trick. The same way with the saw. He testified he checked it out of the toolroom out there. I don't like stuff like that."

4. The Government attorney said: "Now, there is another little matter I would like to bring up. It wasn't brought up by us. It was brought up by the other side: that we are trying to smear him. He has brought them all in himself. He has brought them all in. I am not accusing him of stealing anything except this furniture. You must understand that. Just this furniture and the fact that he had broken into the Belvals. But does he have any regard for the property rights of others? Would you say he had any regard for the property rights of others when it was shown that there was a tire out there—'City Electric Company' written on it in chalk? Does he have any regard for the City Electric Company? When it was also shown that there was a Northland Construction Company skill-saw * * *?"